IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

STEVEN RAY TALBOT                                                                           PLAINTIFF

v.                                    Civil No. 09-5191

DR. HUSKINS; CAPTAIN
ROBERT HOLLY; and
SHERIFF KEITH FERGUSON                                                                   DEFENDANTS

### REPORT AND RECOMMENDAPION OF THE MAGISTRATE JUDGE

Plaintiff, Steven Ray Talbot (hereinafter Talbot), filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Talbot is currently incarcerated in a unit of the Arkansas Department of Correction (ADC). The events at issue in this case occurred when Talbot was in the Benton County Detention Center (BCDC). He contends his constitutional rights were violated in the following ways: (1) he was denied adequate medical care; (2) he was denied an adequate diet; (3) he was verbally abused; and (4) his grievances were not answered.

Defendants filed a motion for summary judgment (Doc. 14). To assist Plaintiff in responding to the summary judgment motion, I propounded a questionnaire (Doc. 19). Talbot filed a timely response (Doc. 20). The summary judgment motion is now ready for decision.

### I. Background

Talbot was booked into the BCDC on March 12, 2008, on a pending criminal charge. *Plaintiff's Response* (Doc. 20)(hereinafter *Resp.*) at ¶ 1. He was released from the BCDC on July 28, 2008. *Id.* at ¶ 2.

When Talbot was booked in he had two medications with him. *Resp.* at ¶ 3. The first was propranolol (take one every morning) and bupropion (one tablet each morning for three days and

-1-

then one tablet twice a day). *Id.* at ¶ 4(A). On his medical questionnaire, Talbot indicated he was under Dr. Santiago's care, was taking the medications listed above, and had Hepatitis A and C and a bad liver. *Id.* at ¶ 4(B). Talbot was seen by Dr. Huskins on March 19th. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at pg. 3; *Resp.* at ¶ 5(without knowledge to agree or disagree). Talbot told the doctor that he was having no problems. *Id.*

Talbot was booked back into the BCDC on May 11, 2009, after he was convicted and sentenced to a term of imprisonment. *Resp.* at ¶ 7(A). He remained incarcerated at the BCDC until he was released to the ADC on September 1, 2009. *Id.* at ¶ 7(B).

He had no medication with him when he was booked in on May 11th. *Resp.* at ¶ 7(C). The first medical request he submitted was about his back having gone out and being in pain. *Id.* He dated the request May 7th but was not incarcerated on that date. The request was marked received on May 28th. *Defts' Ex.* 3 at ¶ 1.

Talbot was seen by Dr. Huskins on May 29th. *Resp.* at ¶ 9(C). He noted Talbot's range of motion was slightly decreased. *Id.* He prescribed Tylenol. *Id.* Notes taken by the nurse indicate that Talbot told her he had a pinched nerve, slipped discs, and had been seeing a chiropractor prior to his incarceration. *Id*. at ¶ 9(D). Talbot indicates he had been going to the chiropractor once or twice a year. *Id.* Talbot was not taking any medication and does not recall when he last saw the chiropractor. *Id.*

Talbot does not recall if he said anything to Dr. Huskins that day about having Hepatitis or a bad liver. *Resp*. at ¶ 9(E). However, Talbot states he did mention it both times he was booked in. *Id.* Talbot also recalls talking to Dr. Huskins about his "liver and Tylenol" before that day. *Id.* On May 29th, Talbot states Dr. Huskins indicated it was "ok to take the Tylenol." *Id.*

-2-

Talbot submitted another medical request dated May 29th stating he had been seen by the doctor but he didn't even look at his back. *Resp.* at ¶ 9(H). Talbot stated he needed to go to the hospital because he could not stand the pain any longer. *Id.* In response, Talbot was told he had been seen by the doctor that day. *Id.* at ¶ 9(I).

On May 29th, Talbot also submitted a grievance stating he had been seen by the doctor but that he was in so much pain that he couldn't stand it. *Resp.* at ¶ 9(F). Talbot stated he needed medical treatment. *Id.* In response, Captain Holly wrote that the doctor makes all medical decisions. *Id.* at ¶ 9(G).

Talbot indicates he told the nurse he needed to be seen by a chiropractor, had been in pain for four days, and did not like the medication prescribed by Dr. Huskins. *Resp.* at ¶ 9(K). She offered to change his medication and the Tylenol was discontinued and Ibuprofen was ordered. *Id.* He was also placed on the list to see the doctor. *Id.*

The nurse noted in Talbot's chart that she had been called to D-pod due to his complaints of back pain. *Defts' Ex.* 2 at pg. 9. She noted Talbot was standing erect, smiling, had good color, and when he walked back into the common room appeared to be in no serious pain or distress. *Id.* Talbot agrees that he did walk back and forth part of the time. *Id.* at ¶ 9(J). However, he indicates he was grimacing from pain and if the nurse had turned on the light she would have seen he was in a lot of pain. *Id.*

Talbot was seen by Dr. Huskins on June 1st. *Resp.* at ¶ 10(A). He noted: "paraspinous lumbar muscle spasm. Leg exam negative." *Id.* He prescribed amitriptyline and continued the Tylenol. *Id.*

Talbot does not recall if he discussed the problems with his liver or Hepatitis that day. *Resp.* at ¶ 10(B). He indicates he had been told by guards and the nurse not to talk to the doctor

-3-

unless the doctor asked a question. *Id.* Talbot indicates he was with the doctor only about thirty seconds. *Id.*

Talbot next requested medical treatment on July 30th. *Resp.* at ¶ 11. He stated he was having pain in his shoulder and arm. *Id.* Talbot was seen by Dr. Huskins on July 31st for neck and arm pain. *Id.* at ¶ 12. He was prescribed Aleve. *Id.*

On August 4th, Talbot asked to see the doctor because of pain in his right arm. *Resp.* at ¶ 13. He said the arm hurt whenever he slept on his right side. *Id.* On August 5th, Talbot submitted another medical request about pain in his right shoulder and arm. *Id.* at ¶ 14. He said the pain kept him awake at night. *Id.* In response, the nurse wrote that Talbot had just seen the doctor for this problem on July 31st and was still taking the naproxen sodium prescribed for pain. *Id.* at ¶ 15(A). She asked if the medication had helped or if he wanted Tylenol or Ibuprofen instead. *Id.*

Talbot was seen by Dr. Huskins on August 7th. *Resp.* at ¶ 15(B). He noted Talbot's range of motion was okay. *Id.* Dr. Huskins prescribed prednisone for five days. *Id.*

On August 9th, Talbot requested medical treatment. *Resp.* at ¶ 16(A). Talbot stated he thought he was having a reaction to medication and was sick to his stomach, hot, had a fast pulse, was pale, sweating, and felt sick. *Id.*

On August 10th, a health services request was sent to the ADC. *Resp.* at ¶ 16(B). It noted Talbot had complained of vomiting blood, was seen by Dr. Huskins, and sent to the Emergency Room at Mercy Medical. *Id.* The ADC responded that Talbot would be "fast-tracked" to the next available bed. *Defts' Ex.* 2 at pg. 12; *Resp.* at ¶ 16(C)(without knowledge to agree or disagree).

Deputy Spahn transported Talbot to the hospital at approximately 7:30 a.m. *Resp.* at ¶ 17(A). Talbot reported to Dr. Henley that he had been having diarrhea for the past two days and it was dark with blood in it. *Id.* at ¶ 17(B). Talbot informed Dr. Henley that he had been diagnosed

with Hepatitis C and Cirrhosis of the liver. *Id.* at ¶ 17(C).

After an IV was started and he was given Protonix, Talbot began to vomit up blood on and off for the next thirty minutes. *Defts' Ex.* 5; *Resp.* at ¶ 17(E)(without knowledge to agree or disagree). An endoscopy procedure was done and esophageal varices were found and band ligation performed to control the bleeding. *Id.* at ¶ 17(F). Talbot remained hospitalized until August 14th. *Id.* at ¶ 18(A). He was discharged with a prescription for Protonix. *Id.* at ¶ 18(B). He was to take two tablets a day for two weeks and then reduce to one tablet daily. *Id.* His diagnoses were: anemia; gastro-intestinal bleed; Hepatitis C; Cirrhosis of the Liver; esophageal varices (enlarged veins in the lower esophagus); and thrombocytopenia (low platelet count). *Id.* at ¶ 18(C).

Talbot reported to hospital staff that he had not received any treatment for Hepatitis C. *Resp.* at ¶ 18(D). He was instructed to avoid NSAIDS (Aleve, Aspirin, Tylenol) and to be on a low sodium and soft diet. *Id.* at ¶ 18(E). An appointment was to be scheduled for an esophagogastroduodenoscopy (EGD) with banding in six weeks with Dr. Raza. *Id.* at ¶ 18(F). Talbot was also to receive a consultation at University of Arkansas Medical Sciences for a liver transplant evaluation. *Id.* at ¶ 18(G).

On August 14th, the jail nurse noted in Talbot's chart that he had been discharged from the hospital with a prescription for Protonix, was to be given a soft low sodium diet and was not to be given NSAIDS. *Resp.* at ¶ 19(A). Dr. Mullins authorized Prilosec to be substituted for the Protonix. *Defts' Ex.* 2 at pg. 7; *Resp.* at ¶ 19(B)(without knowledge to agree or disagree). A soft low sodium diet was ordered for him. *Resp.* at ¶ 19(C).

On August 14th, Talbot submitted a medical request stating that he felt hot with pain in his stomach. *Resp.* at ¶ 20(A). In response, Talbot was told he was on the list to see the doctor on Monday, August 17th. *Id.* at ¶ 17(B). Talbot was seen on August 17th. *Id.* at ¶ 17(C). Dr. Huskins

prescribed Prilosec. *Id.* at ¶ 17(D).

On August 15th, Talbot said the guard doing morning meds tried to give him prednisone instead of omeprazole (Brand Name Prilosec). *Resp.* at ¶ 21(A). In response, Talbot was told that his prescribed medication was given to him. *Id.* at ¶ 21(B). Talbot indicates he did receive omeprazole but the wrong dosage. *Id.* at ¶ 21(C).

On August 16th, Talbot stated he was having stomach pain, a temperature, and was sick to his stomach. *Resp.* at ¶ 22(A). He asked to see the doctor or the nurse. *Id.* He also stated he had been given the wrong medication by the guards. *Id.* In response, Talbot was told he was on the list to see the doctor. *Id.* at ¶ 22(B).

On the morning of August 17th, Talbot complained Guard Morrison gave him prednisone instead of omeprazole. *Defts' Ex.* 4 at pg. 5; *Resp.* at ¶ 23(G)(without knowledge to agree or disagree).

On August 17th, Talbot told Deputy King that he was giving him the wrong medication and he got mad and told Talbot to take it. *Resp.* at ¶ 23(A). Talbot states King refused to check on whether it was the right medication or not. *Id.* Talbot believes King gave him prednisone. *Id.* at ¶ 23(C). Talbot indicates he took the pill because he thought the guard knew what he was doing and that "the pill had changed." *Id.* at ¶ 23(D). Talbot also did not want to get in trouble with the guards. *Id.* Talbot indicates he is sure the medication did not help his stomach and he remained sick. *Id.* at ¶ 23(E). Later in the day, Talbot states he received the medication that matched his "med" sheet. *Id.* at ¶ 23(B).

On August 26th, Talbot submitted a grievance stating he had put in two grievances about receiving the wrong pills and had not heard back. *Resp.* at ¶ 24(A). In response, Captain Holly said he had answered these telling Talbot if he had a problem with medication he needed to see the

doctor. *Id.*

Talbot was asked to review the medication logs and state if he had received all the listed medication on the dates and time listed. *Resp.* at ¶ 25(B). He responded saying he was without knowledge to agree or disagree. *Id.* Talbot was also asked if he received all medication prescribed to him. *Id.* at ¶ 25(A). He responded that he was without knowledge to agree or disagree. *Id.*

Talbot was asked to describe in detail how he believed Dr. Huskins exhibited deliberate indifference to his serious medical needs. *Resp.* at ¶ 26. He responded:

> By giving me meds that were bad for my liver. Also med that thin out my blood. Not taking the time to talk with me about what was going on with my body. When told about getting wrong meds not looking into it. When told the meds [were not] working on me, not [trying] to fix the problem. Just throwing Aspirin at it and telling me that he'll fix me right up. After checking me out for 20 sec. maybe if I was lucky.

*Id.* at ¶ 26.

Talbot was asked to describe detail how he believed Captain Holly violated his federal constitutional rights. *Resp.* at ¶ 27. Talbot did not respond. *Id.*

Talbot never spoke to, or communicated with, Sheriff Ferguson about his medical needs or receiving the wrong medication. *Resp.* at ¶ 28. However, he asserts that Sheriff Ferguson sets the jail policies and hires, fires, and trains jail personnel. *Id.* Talbot mentions: the amount of time the jail doctor spends with each inmate; the medications prescribed; guards not being trained properly to dispense medications; detainees being treated as guilty rather than innocent; and treating detainees as "2nd class causes" causing others in the jail not to give detainees the right treatment. *Id.*

Talbot was provided with a diet adequate to maintain his health. *Resp.* at ¶ 29(A). When the hospital physician directed Talbot to be placed on a soft low sodium diet, the jail kitchen was

directed to provide Talbot with that diet. *Id.* at ¶ 29(B). He began receiving a soft low sodium diet. *Id.* at ¶ 29(C). Talbot indicates, however, that the jail was given a list of foods that would be good for him and he didn't get any of the foods on the list. *Id.* at ¶ 29(B).

Talbot was able to submit grievances and medical requests. *Resp.* at ¶ 30(A). While most of his grievances and requests received a written response, Talbot indicates some were not returned to him. *Id.* at ¶ 30(B). Because he didn't always get a response to his grievances, Talbot did not know what action was being taken "on things like my meds" and his requests to go to the hospital. *Id.* at ¶ 30(C).

Talbot was asked if he suffered any physical injury as a result of actions taken, or not taken, by one or more of the defendants. *Resp.* at ¶ 31. He responded that the doctor had given him medication that hurt his liver and made his blood thin. *Id.* He also indicates his back was hurting for a week and his shoulder and arm for several weeks without receiving medical treatment. At the hospital Talbot indicates he was told to come back if his stomach started hurting or if he had a fever, when both these conditions occurred the guards and medical staff refused to take him to the hospital.

## II. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

### III.  Discussion

As noted above, Defendants have moved for summary judgment on each of Talbot's claims.  I will address them in turn.

*Adequate Medical Care*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, Talbot must prove that Defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component:  'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

I believe there are clearly genuine issues of fact that preclude summary judgment in Dr. Huskins' favor in this case.  When he was booked in, Talbot indicated on his medical questionnaire that he had Hepatitis A and C and a "bad liver."  This questionnaire is placed in

AO72A
(Rev. 8/82)

his jail medical file. This should have been a "red flag" to any medical personnel to either avoid, or be careful when, prescribing any non-steroidal anti-inflammatory drugs (NSAIDS) to him. The medical file and the medication logs show Talbot was prescribed both Naproxen Sodium (Aleve) and acetaminophen (Tylenol). Both are NSAIDS. The jail medical file give no indication as to Dr. Huskins' reasons for choosing to prescribe NSAIDS.

Talbot maintains that his visits with Dr. Huskins did not exceed twenty to thirty seconds during which time he had no opportunity to describe his medical condition or discuss the problems he was allegedly having with the guards dispensing the wrong medications. Talbot indicates, and the records seem to bear out, that his requests for medical care were not dealt with until he became so sick that he had to be treated at the hospital.

With respect to Captain Holly, Talbot has not alleged that he was denied adequate medical care because of actions taken by Holly. *Resp.* at ¶ 27. With respect to Sheriff Ferguson, Talbot seeks to hold him liable because he is "the man in control." A claim of deprivation of a constitutional right cannot be based on a respondeat superior theory of liability. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, Sheriff Ferguson cannot be held liable merely because he employs the individual allegedly responsible for violating Talbot's constitutional rights. *Id.* There is no allegation that Sheriff Ferguson was personally involved in any way in the actions taken by Dr. Huskins. *See Keeper v. King,* 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making the decisions); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

AO72A
(Rev. 8/82)

*Adequate Diet*

Although Talbot did not get all the foods that were on the list of foods that were good for him to eat with his medical condition, he was put on a soft low sodium diet as prescribed and received a diet adequate to maintain his health. *Resp.* at ¶¶ 19(C) & 29(A). This is all the constitution requires. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).

*Verbal Abuse*

Talbot maintains the guards verbally abused him. Clearly, "[v]erbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985). Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court

-11-

for redress, terrorized him with threats of death.").

### *Inadequate Grievance Procedure*

Talbot contends his grievances were not handled properly, he did not always get responses, and he did not get copies of the grievances he did submit. *Resp.* at ¶ 30. Talbot was able to submit grievances and medical requests. *Resp*. at ¶ 30(A). While most of his grievances and requests received a written response, Talbot indicates some were not returned to him. *Id.* at ¶ 30(B). Because he didn't always get a response to his grievances, Talbot did not know what action was being taken "on things like my meds" and his requests to go to the hospital. *Id.* at ¶ 30(C).

However, Talbot has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the grievance procedures. He makes no argument that he was treated differently from other similarly situated prisoners, or his grievances were ignored because of his exercise of his constitutional rights, or his ability to exercise any specific constitutional right was chilled by Defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted). *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*,

932 F.2d 728, 729 (8th Cir. 1991)). A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." Id. (citation omitted). "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

### IV. Conclusion

For the reasons stated, I recommend that the motion for summary judgment (Doc. 14) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to the following: (1) the denial of an adequate diet claim; (2) the verbal abuse claim; (3) the inadequate grievance procedure claim; and (4) all claims asserted against Sheriff Ferguson and Captain Holly. I recommend the motion be denied with respect to the denial of adequate medical care claim asserted against Dr. Huskins.

**The parties have fourteen days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of March 2011.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)